UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRYSTAL DAVIS, Individually And On
Behalf of All Other Persons Similarly
Situated,

Plaintiffs,

v.

THE FOOTBRIDGE COMPANIES, LLC, *et al.*,

Defendants.

C. A. No.  1:09-cv-11133-NG

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER MOTION FOR
CONDITIONAL CERTIFICATION AND
NOTICE TO POTENTIAL CLASS MEMBERS
AND TO EQUITABLY TOLL THE STATUTE OF LIMITATIONS**

Todd S. Heyman (BBO# 643804)
Adam M. Stewart (BBO#661090)
SHAPIRO HABER & URMY LLP
53 State Street
Boston, Massachusetts 02109
Tel:    (617) 439-3939
Fax:    (617) 439-0134
theyman@shulaw.com
astewart@shulaw.com

Richard J. (Rex) Burch (pro hac vice)
Michael K. Burke (pro hac vice)
BRUCKNER BURCH PLLC
1415 Louisiana St., Suite 2125
Houston, Texas  77002
(713) 877-8788 – Telephone
 (713) 877-8065 – Facsimile
rburch@brucknerburch.com
mburke@brucknerburch.com

## I. SUMMARY

Footbridge Engineering Services, LLC and The Footbridge Companies, LLC (collectively Footbridge) hired employees to staff engineering and project controls projects for Footbridge's clients. Footbridge violated the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (FLSA) by paying these employees only their regular hourly rate, even when they worked over 40 hours in a workweek. Unless one of its clients objected, Footbridge applied this "straight-time-for-overtime" scheme across the board to all of the hourly employees it hired to staff its clients' projects. Plaintiff Crystal Davis (Davis) is one such employee. Ms. Davis brings her claims for unpaid overtime against Footbridge individually and as a collective action under the FLSA because Ms. Davis is similarly situated to the other hourly Footbridge employees she seeks to represent. The Court should conditionally certify this action as a collective action and order notice to the potential opt-in plaintiffs so that all other similarly situated employees may make an informed decision about whether to assert claims in this action.

The Court should also equitably toll the statute of limitations for those employees who decide to opt in to this collective action so that their claims are deemed filed on the same day that Ms. Davis filed this action. Both before and after this lawsuit, Footbridge engaged in conduct that unfairly delayed the other employees' ability to both learn of their rights to overtime pay and to opt in to this action. Specifically, Footbridge: (1) resisted Ms. Davis' efforts to discover information that would accurately notify Footbridge's employees of their rights; (2) failed to post legally-required notices informing employees of their right to overtime pay; and, (3) made misleading statements to employees about their right to overtime pay. In addition, Footbridge ignored obvious warning signs that it was violating the FLSA when some of its own clients insisted that it pay overtime to the same employees that Footbridge had denied overtime, without

conducting any investigation as to what the law required.  Instead, it kept its head in the sand until this lawsuit was filed.  If its actions go unchecked, Footbridge will reap the benefits of its misdeeds to the tune of thousands of dollars every day, all at the expense of its employees.

## II.   FACTUAL AND LEGAL BACKGROUND

### 1.   *Ms. Davis' Work Experience With Footbridge*

Ms. Davis worked for Footbridge on a one-year contract from June 2008 to June 2009. Declaration of Todd S. Heyman, Dated May 25, 2010 ("Heyman Decl."), Exhibit A, Excerpts from Deposition of Crystal Davis, pp. 43, 59-60 (hereinafter Davis Depo.).  Footbridge is in the business of staffing engineering and information technology projects for its clients.  Heyman Decl., Exhibit B, Excerpts from Deposition of Footbridge, p. 9 (hereinafter Footbridge Depo.). Ms. Davis worked as a Scheduler/Planner in Tuscaloosa County, Alabama for one of Footbridge's clients, Hunt Refining.  Davis Depo., pp. 43, 59-60.

Generally, Ms. Davis' duties involved "planning, scheduling, [and] execution" of project work for Footbridge's clients.  Davis Depo., p. 16.  Although Ms. Davis spent much of her time working on a computer, she did not design or develop software programs, write computer code or perform any computer programming duties.[1]  Davis Depo., pp. 31, 33-34; Footbridge Depo., p. 24-25.  Ms. Davis filled out a weekly timesheet, approved by the client, which she faxed into Footbridge's offices.  Davis Depo., p. 46.  Footbridge paid Ms. Davis an hourly rate for all the hours she worked, including those in excess of 40 in a workweek.  Davis Depo., pp. 41-42.

### 2.   *All <u>Hourly</u> Project Controls Employees Were Paid Straight Time For Overtime*

Ms. Davis, like other schedulers, planners, and cost engineers, did "project controls" work for Footbridge clients.  Footbridge Depo., p. 45.  Unless the client required otherwise, all

---

[1]      For its part, Footbridge cannot describe with any particularity what Davis' computer-related duties entailed beyond entering data into a software program.  Footbridge Depo., p. 24-25.

*hourly* employees doing "project controls" work for Footbridge clients were paid straight time for overtime until Footbridge changed its policy after this lawsuit was filed and finally began paying time-and-one-half for overtime work hours. Footbridge Depo., pp. 108-109 (noting that all schedulers and planners were paid straight time for overtime, until the policy change after the lawsuit was filed, when Footbridge began to pay overtime to schedulers and planners); Footbridge Depo., pp. 112-113 (noting that all hourly employees were paid overtime when Footbridge changed its policy after the lawsuit, except for those performing information technology or "IT" work; and no cost engineers were performing "IT" work).

    *3.  All <u>Hourly</u> Engineering Employees Were Paid Straight Time For Overtime*

       In addition to "project controls," Footbridge also has an engineering and information technology group. Footbridge Depo., p. 126 (testifying that recruiters work in teams to recruit three groups of employees: "Project controls, engineering, and IT."). Footbridge also paid its employees in the engineering group on an *hourly* basis, and only paid them straight time for overtime until it changed its policy after this lawsuit was filed and also began paying them time-and-one-half for overtime work hours. Footbridge Depo., pp. 44-46 (indicating engineers, as well as planners and schedulers, were all subject to same overtime policy, receiving only straight time until after the lawsuit was filed and the overtime policy was changed); Footbridge Depo., p. 48 (all engineers, except software engineers or those paid on a salary basis, not an hourly basis, were paid overtime with the change in policy after the lawsuit was filed); Footbridge Depo., pp. 111-113 (all design and project engineers were not IT engineers and were paid straight time for overtime until the change in policy after the lawsuit was filed).

4.  *The Only Employees Still Paid On An <u>Hourly</u> Basis That Do Not Earn Overtime Are In The IT Group*

Although Footbridge would no longer classify hourly employees in project controls or engineering as exempt computer professionals, it does still deem members of its IT group as subject to an exemption and continues to pay them straight time for overtime.  *See* Footbridge Depo. pp. 20 & 44 (noting Footbridge thought that Davis was an exempt computer professionial when she worked there, but that if she were hired today, she would be paid time-and-one-half for overtime hours); Footbridge Depo., p. 48 (noting that software engineers are still deemed to fit computer professional exemption and still receive straight time for overtime but that all other engineers, except those converted to be paidon a salary, were paid overtime with the change in policy after the lawsuit was filed); Footbridge Depo., pp. 111-113 (all design and project engineers were not IT engineers and were paid straight time for overtime until the change in policy after the lawsuit was filed).  These employees, referred to as network administrators, systems analysts, software engineers, and programmers, all fall under Footbridge's IT umbrella. Footbridge Depo., pp. 55-56.

The computer professional exemption, unlike the executive, professional and administrative exemptions (often referred to as the "white collar" exemptions), permits the employer to pay an employee on an *hourly* basis and still only pay straight time for overtime.  29 U.S.C. § 213(a)(17)(D); 29 C.F.R. § 541.400(b).  However, the other white collar exemptions require the employer to guarantee the employee a minimum salary, and do not permit the employer to pay the employee on an hourly basis.  29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.100(a)(1) (executive exemption); § 541.200(a)(1) (administrative exemption); § 541.300(a)(1) (professional exemption).  Not surprisingly, the only other employees at Footbridge besides IT employees that are currently not paid overtime at time-and-one-half are

employees who have been converted to receive a salary, and are no longer paid by the hour. Footbridge Depo., pp. 46 & 48 (noting that other engineers who are not software engineers would only get straight time for overtime if they were "guaranteed a salary as opposed to an hourly [rate]."). Footbridge presumably believes that these other employees can qualify as exempt under another white collar exemption if they are guaranteed a minimum salary instead of being paid by the hour. This lawsuit only concerns the employees paid on an hourly basis, and, as a result, any time any employee spent working as a salaried employee is not at issue here.

5. *The Overtime Policy At Footbridge Affected A Large Number Of <u>Hourly</u> Employees in Project Controls and Engineering*

During the last three (3) years, Footbridge has employed numerous hourly employees in the same or similar position as Ms. Davis. Footbridge Depo., pp. 30-33 (estimating that Footbridge paid approximately 70-80 employees straight time for overtime in the three year period pre-dating this action). Unless these employees were IT employees or were converted to be paid on a salary basis, they now receive overtime pay or would receive overtime pay if they continued working for Footbridge. Footbridge Depo., pp. 46, 48. Footbridge has not only identified this group of employees, but has calculated the total number of overtime hours worked by them. Footbridge Depo., pp. 71-72.

6. *Footbridge Ignored The Overtime Issue And Kept Its Employees In The Dark*

Prior to this lawsuit, every Footbridge *hourly* employee was paid according to Footbridge's policy of "straight time for overtime" unless Footbridge's *client* insisted otherwise. Footbridge Depo., p. 26. This decision was made by Footbridge employees who had "no specific training" on the FLSA, had not reviewed the FLSA in the previous five years, and had also never reviewed the FLSA from "cover to cover." Footbridge Depo., pp. 83-84; p. 116. Prior to this lawsuit, the Footbridge employees making the FLSA exemption decisions never

even discussed the impact of paying an employee by the hour as opposed to paying a salary, and, even after the lawsuit was filed, Footbridge did not have an understanding of the most elementary concept of the FLSA exemptions, the "salary basis test":

> Q.     And when you were classifying [employees] as exempt, whose knowledge of the FLSA did you rely on?
>
> A.     I would say mine, Phil's.
>
> Q.     Have you ever had a discussion with Phil, about, prior to the lawsuit, about how salary basis versus hourly basis can affect the overtime exemptions?
>
> A.     No.
>
> Q.     Are you aware of a concept known as the salary basis test?
>
> A.     No.

Footbridge Depo., pp. 118-119.

Notwithstanding this lack of expertise, Footbridge did not look for expert external guidance in determining whether it could lawfully pay its hourly employees straight time for overtime:

> Q.     Did Footbridge hire any consultants or other people to help it determine how to classify employees with respect to the overtime laws prior to the lawsuit?
>
> A.     No.
>
> Q.     Did Footbridge rely on any books in determining how it would classify Crystal Davis with respect to the overtime laws?
>
> A.     Not that I'm aware of.

Footbridge Depo., p. 84.[2]  Instead, the decision to classify these hourly employees as computer professionals was based entirely on Footbridge's employees' knowledge that other companies

---

[2]  Footbridge also did nothing to ensure compliance with state overtime laws:
Q.     Did anyone at Footbridge, to your knowledge do anything to make sure that the contract employees were being paid in accordance with the state overtime laws?
A.     Not to my knowledge.

they had previously worked for, or other companies in the industry, also paid straight time for overtime.  Footbridge Depo., pp. 84-85, 87-88.

What should not go unnoticed by this Court is that Footbridge <u>selectively</u> looked only to those companies that did <u>not</u> pay overtime in determining its own overtime practices.  It knew other companies paid these very same types of employees overtime, because its own clients often insisted Footbridge pay the employees overtime:

> Q.    So what about your FLSA experience led you to … pay some [employees] time and a half and pay others straight time?
>
> A.    What led us to – I believe – at the time, I believed that they all met that [computer professional] standard; *but yet we had some clients that would dictate to pay time and a half, and [we] would follow that based on contractual relationship.*

Footbridge Depo., p. 26 (emphasis added).  Even though its own clients insisted that these employees be paid overtime at time and a half, Footbridge did nothing to investigate whether its employees were properly being denied overtime until this lawsuit was filed:

> Q.    Did you ever ask the clients, why do you insist on paying these people more than you have to?
>
> A.    No.
>
> Q.    Did you ever ask them why they thought that you should pay them time and a half?
>
> A.    No.
>
> Q.    Did you ever go back and look at your own policies and say, gee, client says we should pay them time and a half, I wonder if we should pay them time and a half?
>
> A.    No, not based on that.
> …
> Q.    Other than what you may have heard from [counsel], is there anything that made you go back and rethink the way you had been paying these employees?
>
> A.    I mean, this lawsuit, I guess would be ***the only reason***.

---

Footbridge Depo., p. 86.

Footbridge Depo., pp. 26-27 (emphasis added).  Thus, despite knowledge that some companies dictated that these employees receive time and one half for overtime, Footbridge did nothing to ensure its own overtime practices were lawful until the lawsuit was filed.

Notably, Footbridge also kept its employees in the dark about their overtime rights, both before and after this lawsuit was filed.  Employers are required to display a U.S. Department of Labor (DOL) poster advising employees of their minimum wage and overtime pay rights, "as prescribed by the Wage and Hour Division, in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy."  29 C.F.R. § 516.4.  Here, Footbridge not only failed to provide its employees with a copy of this poster, but had no procedure by which it communicated to its employees their rights under the FLSA:

> Q. How does Footbridge notify its consultants of their rights under the Fair Labor Standards Act?
>
> A. How does Footbridge notify – I'm not sure that I do besides having policies and procedures and people to talk to.  I don't know that I have a specific notification that I send them.
>
> Q. Can you think of … any policies or practices that communicate how the Fair Labor Standards Act applies to consultants?
>
> A. No.

Footbridge Depo., p. 107.  Footbridge fully concedes that "based on the knowledge that [it] gained subsequent to the lawsuit, [it] changed policies and procedures" and now pays time and half to its hourly employees in project controls and engineering.  Footbridge Depo., p. 120.  Indeed, Footbridge's exemption decisions are no longer based just on management's past experience in the industry but are now based on advice of counsel.  Footbridge Depo., p. 123.

However, despite Footbridge's new appreciation for the law's impact on its exemption decisions, it still has made no effort to communicate to its employees their overtime rights:

Q.     Has Footbridge attempted to communicate with any employees, former
       employees who were paid hourly plus straight time for overtime since the filing of
       this lawsuit?

A.     In regards to?

Q.     The lawsuit.

A.     No.

Q.     How about with respect to their overtime rights?

A.     No.

Footbridge Depo., p. 131.

Adding insult to injury, in announcing the change in overtime policy, Footbridge

specifically did not inform its employees that the change in policy had anything to do with its

interpretation of the law, ensuring its employees would not discover their overtime rights:

Q.     How about generally, what were they told?

A.     General change in policy and procedure.

Q.     Were these people told that you were changing the policy because of a change in
       Footbridge's interpretation of the law?

A.     No. Change in policy.

Footbridge Depo., p. 43.

Footbridge's failure to understand the FLSA exemptions was not only a deliberate choice

in the face of undisputed knowledge that some industry members paid overtime to the same type

of employees, but it also led to the misinformation of the affected employees.  Both Ms. Davis

and other employees specifically asked about whether they would receive overtime pay and were

given answers suggesting that their contractual arrangement would properly govern their

overtime pay – without any reference to the FLSA.  *See*, *e.g.*, Davis Depo., pp. 41-42 (told that

her contract governed overtime and she was too late to complain now, having already signed);

Exhibit 2, Declaration of Gerald Fleming, ¶ 7 (hereinafter Fleming Dec.) (told he was not elegible for overtime compensation); Exhibit 3, Declaration of Cynthia Hammack, ¶ 7 (hereinafter Hammack Dec.) (told she was not paid overtime because Footbridge paid a housing allowance).   Indeed, Footbridge's 30(b)(6) witness did not dispute that Ms. Davis asked her recruiter about overtime, but stated that he would not have said anything differently than the recruiter did but to add "if there were any other problems, that she should have brought that up through the chain."   Footbridge Depo., pp. 126-127.   Other employees were simply never informed of their rights to overtime at all in any way.  Exhibit 4, Declaration of Jim Dozier, ¶ 6 (hereinafter Dozier Dec.); Exhibit 5, Declaration of William Bevard, ¶ 6 (hereinafter Bevard Dec.); Exhibit 6, Declaration of David Tuchman, ¶ 6 (hereinafter Tuchman Dec.).   Given Footbridge's failure to provide a copy of the DOL poster or otherwise inform the employees of their overtime rights, it cannot be disputed that these employees were not at fault for any confusion regarding their right to receive overtime pay at time and a half their hourly rates.

**III.   ARGUMENT**

**A.    The Court Should Conditionally Certify This Action And Send Notice To The Class**

*1.    Certification Is Appropriate When There Is A Threshold Showing That Other Employees Are Similarly Situated*

An FLSA claim may be brought "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated."   *Kane v. Gage Merchandising Servs., Inc.*, 138 F. Supp. 2d 212, 213-14 (D. Mass. 2001)(quoting 29 U.S.C. § 216(b)).   This provision establishes an "opt-in" scheme in which potential plaintiffs must affirmatively notify the court of their intention to be a party to the class action.  *Kane*, 138 F. Supp. 2d at 214.   To determine whether potential plaintiffs are "similarly situated" for purposes of § 216(b), most

courts apply a two-step process. *See Id.* (citing *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207 (5th Cir. 1995); *see also*, *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).[3]

At the first step or "notice" stage, courts will provisionally certify a collective action based on a "lenient standard" if there are substantial allegations that the putative class members were victims of a single decision, policy, or plan that violated the law. *Kane*, 138 F.Supp.2d at 214 (quoting *Mooney*, 54 F.3d at 1214 & n.8). The second step occurs after discovery, when the defendant may file a motion for "decertification." *See Kane*, 138 F.Supp.2d at 214 (citations omitted). At that stage, the Court will have more information to determine whether the named plaintiff(s) and the opt-ins are similarly situated. *See Id.*

"Only a preliminary finding of 'similarly situated' plaintiffs is necessary to authorize notice to potential class members." *Trezvant v. Fidelity Employer Servs., Corp.*, 434 F.Supp.2d 40, 44 (D.Mass. 2006) (*Cintron v. Hershey Puerto Rico, Inc.*, 363 F.Supp.2d 10, 16 (D.P.R. 2005)). Usually, the initial stage determination is based "only on the pleadings and any affidavits which have been submitted." *Trezvant*, 434 F.Supp.2d at 44 (citing *Kane*, 138 F.Supp.2d at 214). As a result of the minimal evidence available, this determination is made using a fairly

---

[3] The *Kane* decision noted that some courts, including some in the First Circuit, have utilized a different method to answer the "similarly situated" question premised upon the Federal Rule of Civil Procedure 23 numerosity, commonality, typicality and adequacy of representation factors. *Kane*, 138 F.Supp.2d at 214. This approach, however, has been roundly criticized by every appellate court to consider the issue. *See*, *e.g.*, *DeAsencio v. Tyson Foods, Inc.* 342 F.3d 301, 306 (3rd Cir. 2003)(noting that FLSA cases *cannot* be certified under Rule 23, and that Rule 23 is *inapplicable* to FLSA actions); *Theissen v. GE Capital Carp.*, 267 F.3d 1095, 1105 (10th Cir. 2001)("to interpret the 'similarly situated' standard by simply incorporating the requirements of Rule 23…would effectively ignore Congress' directive."); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096n. 12 (11th Cir. 1996)(the requirements for pursuing a 216(b) class action are independent of, and unrelated to, the requirements for a class action under Rule 23…); *King v. GE Co.*, 960 F.2d 617, 621 (7th Cir. 1992); *E.E.O.C. v. Pan American World Airways, Inc.* 897 F.2d 1499, 1504 (9th Cir. 1990)(FLSA section 16(b) creates a vehicle, "wholly apart from Fed. R. Civ. P. 23, for employees to bring…class actions for damages"). Thus, the overwhelming majority of federal courts employ the two-step "conditional certification" method in administrating FLSA collective actions. *See McQuay v. American Int'l Group, Inc.*, 2002 WL 31475212, *2 (E.D.Ark. Oct. 25, 2002)(citing *Mooney*, 54 F.3d at 1207).

lenient standard, which typically results in conditional certification of the representative class. *Trezvant*, 434 F.Supp.2d at 44 (citing *Kane*, 138 F.Supp.2d at 214).

At this stage, courts do not need "to make any findings of fact with respect to contradictory evidence presented by the parties or make any credibility determinations with respect to the evidence presented." *Trezvant*, 434 F.Supp.2d at 44 (quoting *Kalish v. High Tech Inst.,* 2005 WL 1073645, *2 (D.Minn. Apr. 22, 2005)). Plaintiffs can meet their burden at this initial stage by making a modest factual showing or asserting *substantial* allegations that "the putative class members were together the victims of a single decision, policy, or plan that violated the law." *Trezvant*, 434 F.Supp.2d at 44 (emphasis in original)(quoting *Thiessen v. General Elec. Capital*, 267 F.3d 1095, 1102 (10th Cir. 2001)(other citations omitted)).

   2.    *Ms. Davis Meets The Lenient "Similarly Situated" Standard for Conditional Certification*

         (a).    Ms. Davis and the Class Were All Subject To The Same Invalid Payroll Policy

Here, Ms. Davis moves this Court to authorize her to send notice to the following Class:

> All hourly employees in Footbridge's project controls and engineering groups that worked more than 40 hours in at least one workweek since July 2, 2006.

By limiting notice to employees who were both (1) hourly and (2) not in Footbridge's Information Technology group, there is no argument that notice would be sent to any employee whom Footbridge itself has not already determined to be entitled to overtime pay. As Footbridge's current policies now reflect, as discussed above, the only employees who are not paid time and one-half for overtime are either members of the IT group or are salaried, not hourly, employees. This is because the only exemption that could conceivably apply to an hourly employee is the computer professional exemption, but even Footbridge's current overtime policy confirms that hourly employees in the project controls and engineering groups do not

qualify for that exemption.  Thus, this Class of employees were all treated identically both before and after this lawsuit was filed.

Before the lawsuit, Footbridge paid Ms. Davis and the Class by the hour and paid them their straight hourly rate regardless of the number of hours they worked.  Footbridge Depo., p. 33.  Payment of straight time wages to hourly workers for overtime hours worked constitutes a willful violation of the FLSA as a matter of law.  *See Waldbaum, Inc.*, 52 F.3d at 41; *Brown v. L & P Industries, LLC*, 2005 WL 3503637 at *10-11 (E.D.Ark. 2005); *Hardrick v. Airway Freight Sys., Inc.*, 63 F.Supp.2d 898, 904 (N.D.Ill. 1999)("[U]nder the FLSA, if a covered hourly employee (such as Plaintiff(s)) works more than 40 hours in a given workweek, such employee(s), *per se*, must be paid a rate not less than one and one-half times his regular rate of pay.")(citation omitted).  Ms. Davis and the Class, therefore, were victims of a single decision, policy or plan that indisputably violated the FLSA – namely payment of straight-time wages for overtime work hours.  Therefore, all of Footbridge's project controls and engineering employees who were subject to this "straight time for overtime" policy are "similarly sitated."  *See Trezvant*, 434 F.Supp.2d at 44 (quoting *Thiessen*, 267 F.3d at 1102).

<u>(b).     Ms. Davis and the Class Performed the Same or Similar Duties</u>

Ms. Davis and the Class worked as Schedulers, Planners, Scheduler/Planners, Cost Engineers, Estimators, or similar jobs for Footbridge.  Davis Depo., pp. 16, 59-60; Fleming Dec., ¶ 2; Hammack Dec., ¶ 2; Dozier Dec. ¶ 2; Bevard Dec., ¶ 2; Tuchman Dec., ¶ 2.  Ms. Davis and the Class spent much of their time working with various software programs on a computer. Davis Depo., pp. 33-34; Fleming Dec., ¶ 2; Hammack Dec., ¶ 2; Dozier Dec. ¶ 3; Bevard Dec., ¶ 3; Tuchman Dec., ¶ 3.  However, neither Ms. Davis nor the Class designed or developed software programs, wrote computer code or performed any computer programming duties.  *Id.*

Even if the job titles and duties of the Class varied somewhat from day-to-day or location-to-location, this does not render collective treatment inappropriate.  Courts have consistently found that "[d]ifferent job titles or positions do not preclude a finding that plaintiffs are 'similarly situated.'"  *Trezvant*, 434 F.Supp.2d at 48.[4]  Therefore, the fact that Ms. Davis and the Class are similarly situated (because they were all paid straight time wages for overtime work) is not diminished because they may have held differing job titles with somewhat differing responsibilities.  Further, where actual job duties are similar, courts permit collective actions to proceed even in the face of arguments that an exemption defense may be raised.  *Wise v. Patriot Resorts Corp.*, 2006 WL 6110885, *2 (D.Mass. Feb. 15, 2006)(citations omitted).  Any exemption defenses are addressed on the merits at a later stage in the litigation.  *Id.*  Therefore, the fact that Footbridge may claim Ms. Davis was exempt from the FLSA does not factor into the Court's decision at this stage.[5]  Thus, certification is appropriate at this time.

3.      *The Court Should Authorize Notice To The Class*

A collective action allows plaintiffs the advantage of lower individual costs and benefits the judicial system by efficient resolution of common issues of law and fact arising from the

---

[4]      *See also*, *Prater v. Commerce Equities Management Co.*, 2007 WL 4146714, *7 (S.D.Tex. Nov. 19, 2007)(the fact that the potential plaintiffs have different job titles or job duties does not render conditional certification improper); *Donohue v. Francis Servs., Inc.*, 2004 WL 1161366 at *3 (E.D.La. May 24, 2004)("The Court rejects the argument that such a class is problematic because it includes individuals from various positions, locations, etc.; the law is plain that this does not undermine the 'similarly situated' requirement.")(citation omitted); *Garza v. Chicago Transit Authority*, 2001 WL 503036, *3 (N.D.Ill. May 8, 2001)(" That the Plaintiffs and other potential plaintiffs may have different jobs in the rail system, earn different amounts of money, and have attended different amounts or types of training does not mean that they are not operating under the same policies that allegedly entitle them to overtime pay.").

[5]      Though courts do not require a named plaintiff to provide testimony from potential opt-ins to establish that she is similarly situated, courts look upon such evidence favorably.  *See Trezvant*, 434 F.Supp.2d at 45.  Here, Ms. Davis provided declarations from five other former employees of Footbridge testifying that they performed similar duties as did Ms. Davis and, further, that they were paid straight time for overtime just like Ms. Davis.  Fleming Dec., ¶ 5; Hammack Dec., ¶ 5; Dozier Dec. ¶ 4 & 6; Bevard Dec., ¶ 6; Tuchman Dec., ¶ 6.  Several employees also state that, once they learned of this litigation, they were interested in joining to vindicate their rights.  Dozier Dec. ¶ 7; Bevard Dec., ¶ 7; Tuchman Dec., ¶ 7.  This evidence weighs heavily in favor of conditional certification of the Class.

same alleged activity in a single proceeding.  *Hoffman-LaRoche Inc. v. Sperling,*  493 U.S. 165, 170 (1989)(discussing the FLSA's collective action procedure as incorporated by the Age Discrimination in Employment Act).  However, these benefits "depend on employees receiving ***accurate and timely notice*** concerning the pendency of the collective action, so that they can make informed decisions about whether to participate."  *Id.*  (emphasis added).  When a collective action is filed, courts have the managerial responsibilty to ensure that the joinder of additional plaintiffs is accomplished in an efficient and proper manner.  *Id.* at 170-71.  Timely, accurate notice is also important because the action is considered commenced for purposes of the statute of limitations only when an employee's written consent is filed with the court.  *See McLaughlin v. Boston Harbor Cruises, Inc.*, 2006 WL 1998629, *1-2 (D.Mass. Jul. 17, 2006).

Ms. Davis has clearly exceeded the standard for obtaining collective certification of this case.  She has shown that she and the other class members were vicitims of Footbridge's "straight time for overtime" policy until it changed its policy after the lawsuit was filed.[6]  The benefits of collective treatment depend upon the potential class members' receipt of timely, accurate and informative notice.  *Sperling,*  493 U.S. at 170.  Ms. Davis' proposed notice to the class is complete, truthful, and in plain English.  *See* Exhibit 6.  Accordingly, Ms. Davis proposes sending the proposed notice and consent form to join this action attached to her motion to the potential members of the Class.

---

[6]     When, as here, a willful violation of the FLSA is alleged, courts routinely find it proper to issue notice to individuals employed at any time within three (3) years of the complaint.  *See*, *e.g.*, *Poreda v. Boise Cascade, L.L.C.*, 532 F.Supp.2d 234, 237 (D.Mass. 2008); *Tidd v. Adecco USA, Inc.*, 2008 WL 4286512, *5 (D.Mass. Sep. 17, 2008); *Lopez v. Sam Kane Beef Processors, Inc.*, 2008 WL 565115, *2 (S.D.Tex. Feb. 29, 2008).

**B.      The Court Should Toll The Statute Of Limitations To The Complaint's Filing Date**

     *1.      Equitable Tolling is Necessary to Preserve the Class Members' Claims*

In Rule 23 actions, the filing of the complaint tolls the statute of limitations for the class members. *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 360 (1983). Under the FLSA, however, "no person can become a party plaintiff and no person will be bound by or may benefit from the judgment unless he has affirmatively 'opted into' the class; that is, given his written, filed consent." *La Chapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 287 (5th Cir. 1975); 29 U.S.C. § 216(b). Normally, filing a consent tolls the statute of limitations for a plaintiff in an FLSA collective action as of the date the consent is filed, not the date of the complaint. 29 U.S.C. §§ 255, 256. Unfortunately, by delaying notice to the Class, "**defendants can bleed value out of a large pool of outstanding FLSA claims in a way that they cannot with a comparable group of Rule 23 claims**." *Nash v. CVS Caremark Corp.*, 2010 WL 446178, *5 (D.R.I. Feb. 9, 2010) (emphasis added).

To prevent a defendant from "'escap[ing] liability' because of his or her own misdeeds," courts apply equitable tolling to preserve a plaintiff's claims. *Ruffino v. State Street Bank and Trust Co.*, 908 F.Supp. 1019, 1040 (D. Mass. 1995)(*quoting Kale v. Combined Ins. Co. of America*, 861 F.2d 746, 752 (1st Cir. 1988)). This doctrine clearly applies to cases brought under the FLSA because the doctrine of equitable tolling "is read into every federal statute of limitations." *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946). Two bases for equitable tolling the First Circuit recognizes include: (1) affirmative misconduct by the defendant; and (2) a defendant's failure to post notice of legal rights. *Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 46-47 (1st Cir. 2005).

     *2.      Footbridge Should Not Escape Liability By Resisting Routine Discovery*

In FLSA collective actions, affirmative misconduct includes a defendant's refusal to produce contact information of potential class members necessary to facilitate notice of an FLSA action. *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 542-43 (N.D.Cal. 2007); *Quintanilla v. A & R Demolition Inc.*, 2006 WL 1663739, *2 (S.D.Tex. Jun. 13, 2006); *Boldozier v. American Family Mut. Ins. Co.*, 375 F.Supp.2d 1089, 1092-93 (D.Colo. 2005). Footbridge resisted several discovery topics, including disclosure of the contact information of potential Class members. *See* Docket No.. 21, Plaintiff's Memorandum in Support of Motion to Compel; Docket No.. 24, Opposition to Plaintiff's Motion to Compel. This information is discoverable even in the absence of collective action allegations because these individuals are potential witnesses. *See* Docket No. 21. Their identity is also necessary to define the scope of the Class.

Footbridge calculates its potential liability "on the order of hundreds of thousands" for the Class. Footbridge Depo., p. 71-72. Dividing this potential liability over the FLSA's two-year limitations period, Footbridge stands to avoid paying thousands of dollars every week it can delay notice to the Class.[7] The Court should not allow Footbridge to "bleed value out of" the Class' claims. *See Nash*, 2010 WL 446178 at *5. Instead, the Court should toll the statute of limitations so that Footbridge may not unfairly gain from its baseless resistance to discovery. *See Boldozier*, 375 F.Supp.2d at 1092-93 (class members' claims tolled back to filing date of complaint because defendant refused to provide contact information for former employees);

---

[7]    The thousands of dollars per week that Footbridge avoided by resisting discovery will double in amount if it loses its good faith affirmative defense to liquidated damages. 29 U.S.C. § 260. Further, Footbridge's liability will increase by an untold amount if Davis proves a willful violation of the FLSA, invoking a three-year limitations period. 29 U.S.C. § 255(a). As Davis previously noted, payment of straight time wages to hourly workers for overtime constitutes a willful violation of the FLSA as a matter of law. *See Waldbaum, Inc.*, 52 F.3d at 41; *L & P Industries*, 2005 WL 3503637 at *10-11; *Airway Freight Sys.*, 63 F.Supp.2d at 904. A finding of a willful violation, in turn, precludes a finding of good faith. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1021 (1st Cir. 1979). Held in this light, Footbridge's financial incentive to block the Class from learning of their rights becomes crystal clear.

*Adams*, 242 F.R.D. at 542-43.   Accordingly, Ms. Davis requests the Court toll the statute of limitations for the Class to the filing date of the complaint.

       3.     *Equitable Tolling Applies Because Footbridge's Employees Were Misled*

Affirmative misconduct also exists when a defendant "lulls the plaintiff into inaction." *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 151 (1984). Footbridge's employees have no reason to suspect their rights are wasting away by not filing a notice of consent.  Indeed, Footbridge told its employees that they now get overtime due to a change in Footbridge's policies – not because the law requires Footbridge to pay overtime (or because Ms. Davis brought this suit to remedy Footbridge's violation of the law).  Footbridge Depo, p. 43.

In addition, when employees like Ms. Davis, Mr. Fleming and Ms. Hammack specifically inquired about overtime pay, they were led to believe that they were not entitled to overtime pay. Davis Depo, pp. 41-42 (told contract governed the issue and she already signed it); Fleming Dec., ¶ 7 (told he was not elegible for overtime); Hammack Dec., ¶ 7 (told she would not be paid overtime because Footbridge paid a housing allowance).  Federal courts equitably toll the statute of limitations in FLSA actions where the employer's conduct, like Footbridge's conduct here, renders reliance on the statute of limitations inequitable.  *Henchy v. City of Absecon*, 148 F.Supp.2d 435, 439 (D.N.J. 2001)(tolling the statute of limitations in part because the employer "assured [the employee] that the overtime compensation provided for [by contract] was proper"noting that "employer's actions need not be 'egregious acts of deception' in order to toll the limitations period."); *Blake v. CMB Construction*, 1993 WL 840278, *6 (D.N.H. Mar. 30, 1993)(tolling the statute of limitations in part because "an employer's misstatement of employees' entitlement to overtime pay … and [its] engaging in a general course of conduct likely to confuse … employees with regard to their overtime compensation rights, all militate in

favor of applying the equitable tolling" and particularly because the employer's "failing to correct the obvious confusion concerning … overtime pay rights under the Act" rendered application of the statute of limitations inequitable); *Hodgson v. Holden Hospital, Inc.*, No. 2693, 1970 WL 748 at *2-3 (S.D.W.Va. 1970)(holding employee's contention that employer represented to employee that he had been lawfully paid raised factual issue as to whether employer was "inequitably relying upon the statute of limitations" because "no man may take advantage of his own wrong.").

Moreover, the employer's conduct creating the inequitable situation warranting tolling need not be the result of bad faith or intentional deception. *Kamens v. Summit Stainless, Inc.*, 586 F.Supp. 324, 328 (E.D.Penn. 1984)("A misrepresentation, if proven, equitably tolls the statute of limitations even if it was not made negligently or fraudulently."); *Ke v. Saigon Grill*, 595 F.Supp.2d 240, 259 (S.D.N.Y. Oct. 21, 2008)(equitable tolling is available even where employer is not "guilty of fraudulent concealment"). Rather, simply creating a situation in which an employee would be unfairly deprived of knowledge concerning his or her rights to overtime pay is sufficient to toll the statute of limitaitons. *Id.*

Finally, as discussed above, Footbridge neither provided its hourly workers with a copy of the DOL poster concerning overtime rights that is required by 29 C.F.R. §516.4, nor made any other effort to inform its employees of their rights to overtime pay. Courts often apply equitable tolling when an employer fails to display this poster in a conspicuous location. *Cortez v. Medina's Landscaping, Inc.*, 2002 WL 3117541, *6 (N.D.Ill. Sep. 30, 2002)(citing *Bonham v. Dresser Indus.*, 569 F.2d 187, 193 (3rd Cir. 1978)); *Blake v. CMB Const.*, 1993 WL 840728, *6 (D.N.H. Mar. 30, 1993); (citing *Kamens v. Summit Stainless, Inc.*, 586 F.Supp. 324, 328 (E.D. Pa. 1984)). Part of the reason for this rule is that the FLSA contains no statutory penalty for

failing to comply with the notice-posting requirement. *Cortez*, 2002 WL 3117541 at *5. "Given the strong counterincentives to hide one's violations from employees and to credibly feign non-willfulness when discovered, the goal of informing employees of their rights stands a chance of realization only through [applying equitable tolling]." *Id.*; *see also*, *Kale v. Combined Ins. Co. of Am.*, 861 F.2d 746, 753 (1st Cir. 1988)(If "the employee has no knowledge of his rights and his ignorance is due to misleading conduct by the defendant or failure of the defendant to post the required [] notices, then an initial case for equitable tolling has been made.")(discussing equitable tolling in the context of workplace notices required by the Age Discrimination in Employment Act).

Because Footbridge concedes it does not display the required DOL poster and has not provided its employees with accurate information regarding their rights to overtime pay even after the complaint was filed (a time at which there was no question Footbridge was on notice, or should have been on notice, that it was violating the FLSA), an initial case for equitable tolling has, thus, been made. *See Kale*, 861 F.2d at 753. Accordingly, the court should toll the statute of limitations for the Class back to the filing date of the complaint. *Cortez*, 2002 WL 3117541 at *6; *Blake*, 1993 WL 840728 at *6; *Kamens*, 586 F.Supp. at 328.

IV.    CONCLUSION

For the reasons stated herein, the Court should grant Crystal Davis' Motion for Conditional Certification and Notice to Potential Class Members and Motion to Equitably Toll the Statute of Limitations.

Respectfully submitted,

Dated:  May 25, 2010                    **/s/ Todd S. Heyman**
                                        Todd S. Heyman (BBO# 643804)
                                        Adam M. Stewart (BBO#661090)
                                        **SHAPIRO HABER & URMY LLP**
                                        53 State Street
                                        Boston, Massachusetts 02109
                                        Tel:     (617) 439-3939
                                        Fax:     (617) 439-0134

                                        **BRUCKNER BURCH PLLC**
                                        Richard J. (Rex) Burch (*pro hac vice*)
                                        Michael K. Burke (*pro hac vice*)
                                        1415 Louisiana St., Suite 2125
                                        Houston, Texas  77002
                                        (713) 877-8788 – Telephone
                                        (713) 877-8065 – Facsimile
                                        rburch@brucknerburch.com
                                        mburke@brucknerburch.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's ECF system on the day this document was filed.

**/s/ Todd S. Heyman**
Todd S. Heyman